In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-22-00119-CR**
_____

**GEORGE VANHOWTEN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 221st District Court**
**Montgomery County, Texas**
**Trial Cause No. 21-07-09933-CR**

---

### MEMORANDUM OPINION

George Vanhowten (Vanhowten or Appellant) appeals his conviction for assault family violence by impeding breath or blood circulation with a prior family violence conviction, a second-degree felony. *See* Tex. Penal Code Ann. § 22.01(b-3). In his sole appellate issue, Vanhowten argues that error in the jury charge deprived him of a fair trial and caused him egregious harm. We affirm.

Background and Evidence at Trial

The indictment by the grand jury alleged the following:

> George Vanhowten, on or about July 15, 2021, . . . intentionally, knowingly, or recklessly cause[d] bodily injury to [C.V.[1]], a member of the defendant's family or a member of the defendant's household or a person with whom the defendant has or has had a dating relationship, as described by Section 71.003 or 71.005 or 71.0021(b), Family Code, by intentionally, knowingly, or recklessly impeding the normal breathing or circulation of the blood of [C.V.], by applying pressure to [C.V.]'s throat or neck or blocking [C.V.]'s nose or mouth,
>     And it is further presented in and to said Court, that before the commission of the offense alleged above, on June 9, 2006, in Cause Number 06-213364 in the County Court of Law No[.] 1 of Montgomery County, Texas, the defendant was convicted of the offense of Assault Causes [sic] Bodily Injury Family Member, an offense under Chapter 19, Chapter 22, Section 20.03, Section 20.04, or Section 21.11 of the Penal Code, against a person whose relationship to or association with the defendant is described by Section 71.003, 71.005 or 71.0021(b) of the Family Code[.]

Vanhowten pleaded "not guilty" and elected to have the trial court determine his punishment.

At trial, the victim, C.V., testified that Vanhowten is her husband and she was in the process of separating from him when he injured her on the morning of July 15, 2021, at their home. According to C.V., that morning Vanhowten told her that he had a dream about her "sleeping with a mutual friend[,]" Vanhowten took her

---

[1] We refer to the victim by her initials to conceal her identity. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

phone from her, and he went into the master bedroom. She testified that when she went into the master bedroom to attempt to retrieve her phone, he "put [her] on top of the bed and put his leg on [her] and went through [her] phone." She testified that their three-year-old daughter was underneath her crying when Vanhowten pinned C.V. down, and that while he was holding her down with his knee, she bit him and hit him to try to get him off their daughter. C.V. testified that Vanhowten "pushed his forearm harder in [her] mouth[]" and she wrestled free from him and fell to the floor. According to C.V., Vanhowten pinned her down again, put more pressure on her, and put his knee "in [her] chest[.]" She testified that her "chest popped[,]" and it sounded "[l]ike a knuckle being popped[,]" and it felt as if her "whole body burned." C.V. testified that when Vanhowten's arm was across her neck it affected her breathing, and that it was "hard for her to breathe."

C.V. testified she yelled for her ten-year-old son to call 911, he opened the bedroom door, and ran out of the house for help. According to C.V., the only phones they had were cell phones, and Vanhowten had them in his hands. Vanhowten began running after her son, and C.V. put herself in front of the front door to protect her son. C.V. testified that Vanhowten then grabbed her by the hair and pulled her away from the door and then she "wrapped [her]self around his legs." Vanhowten eventually ran out of the back door, and C.V. locked her daughter in the truck because C.V. was afraid her daughter was going to get hurt. C.V. then ran down the

3

road after Vanhowten because Vanhowten was going after her son, she jumped on Vanhowten, and he "flipped [her] over on the road and pinned [her] down some more[]" with his knee on top of her throat and back. According to C.V., she was unable to breathe normally, it was hard to yell, and she was begging somebody to call for help. C.V. agreed at trial that Vanhowten impeded her normal breathing during the assault.

She testified that she heard her neighbor open the door and say she "was on the phone with them[,]" and Vanhowten got off of C.V. and started walking away with her phone still in his hands. The police arrived, C.V. talked to EMS, and EMS checked her vital signs and advised her to go to the emergency room. She declined to go to the emergency room with EMS because she wanted to make sure she had someone to look after her children. She called her friend and her friend's daughter came to watch the children while the friend took C.V. to the hospital.

C.V. testified that when she was at the hospital, she had painful scratches, she was bruised, and she had red marks on her body. In the days following, she had swelling to her neck and had difficulty swallowing. According to C.V., hospital tests showed she had a torn artery on the right side of her neck, which was the same area where Vanhowten had put pressure on her neck, and she had to stay in an intensive care unit for a few days. C.V. testified that when she got out of ICU, she had to take blood thinners, blood pressure medication, and pain medication. When she was

4

released from the hospital, she had medical restrictions and she had to have help caring for her children for over three weeks.

During cross-examination, C.V. testified that she did not show the police her injuries when they arrived because she was "just crying, telling them thank you for showing up[,]" and law enforcement did not take photographs of her injuries. She admitted that during Vanhowten's assault she "probably did[]" hit him in the mouth causing his lip to bleed.

Marlene, C.V.'s neighbor, testified that she was seventeen years old, and on the day of the assault, she was inside her home when she heard her neighbor's truck alarm going off and she opened her door. According to Marlene, she saw the man and woman who lived across the street in the road, and the man was on top of the woman, he was holding the woman down and grabbing her arms with his knee on her waist and stomach, the woman was trying to get up, and the woman was screaming for help. Marlene was concerned and asked if she needed help, and the woman told Marlene to call the police. Marlene first called 911 and then the police. Once the police arrived, they told Marlene she would later need to provide a statement, but they never followed up with her. A recording of Marlene's 911 call was admitted into evidence and played for the jury.

Colleen, C.V.'s friend, testified that C.V. called her on that day crying, she was hard to understand but that she said, "he went after [C.V.'s son,]" and Colleen

5

went to C.V.'s house. According to Colleen, when she arrived the police were at C.V.'s house and C.V. was in her truck crying. One of the officers asked Colleen if she could take C.V. to the hospital, and Colleen agreed to do so as soon as they could arrange for someone to watch C.V.'s children. Colleen testified her daughter watched the children while Colleen took C.V. to the hospital. On the way to the hospital, C.V.'s voice was raspy, she was in shock and crying, she appeared to be in pain, and she was having difficulty breathing, swallowing, and talking. The photographs Colleen took of C.V. at the hospital that morning were admitted into evidence and published to the jury. According to Colleen, the photographs show scratches and discoloration to various parts of C.V.'s body, including her neck. Colleen's daughter and a couple of other people had to help C.V. for a few weeks after C.V. was released from the hospital because C.V. could not bathe herself or even take care of or hug her children. According to Colleen, it was at least six weeks before she would leave C.V. by herself, and for a few weeks after the assault, C.V. was in pain and had difficulty eating, drinking, and swallowing her medications.

Officer Christopher Bush with the City of Patton Village Police Department testified that he responded to the family violence call on July 15, 2021. According to Officer Bush, when he arrived other officers were on the scene and he went to talk to C.V. C.V. was crying, had difficulty completing sentences, and appeared scared. C.V. told him that Vanhowten had accused her of cheating, had taken her phone, and

6

when she was trying to get her phone back, Vanhowten physically assaulted her. C.V. told Officer Bush that Vanhowten held her down, put his knee to her chest and his arm across her throat and mouth trying to hold her down while he looked through her phone. The altercation continued, and Vanhowten held her down while pushing his knee on her chest "and arm on her neck[,]" and then it continued outside. C.V. reported to Officer Bush that during the assault it was hard for her to breathe and "hard to get air in[,]" and that she thought she was going to pass out multiple times. Officer Bush was the lead officer on the case but never obtained a statement from the neighbor who called 911, although in hindsight he believed he should have. Officer Bush also admitted he should have gone inside the home and that he should have taken photographs at the scene, but he explained that his small police department did not issue cameras, and he has since purchased his own camera to keep in his patrol bag. He also did not take photographs of C.V.'s injuries but he recalled observing that her injuries were consistent with someone applying pressure to her throat and she had scratches on her neck and small abrasions around the neck and chest area. He had C.V. write a statement at the scene. Officer Bush testified that based on what he learned at the scene, Vanhowten was arrested and booked into jail.

Dr. Aaron Kornhauser, a board-certified emergency room physician, testified that he treated C.V. on July 15, 2021. According to Dr. Kornhauser, C.V. reported

7

being assaulted and choked by her husband, that her husband's knee was to her chest and neck, and that she had chest pain and generally felt sore. She was distraught, he did not note any bruising on her neck, and she was "talking and breathing fine" at the time he examined her. He ordered testing to determine whether there were internal injuries. Dr. Kornhauser testified that "it happens all the time[]" for someone to press down hard enough on someone's neck to make it difficult to breathe while the pressure is on but it may not leave bruises. The tests did not show injury to her breathing, but they did show a small tear in her internal carotid artery on the right side. Dr. Kornhauser testified that the artery gives blood flow to the brain, and that due to the nature of the injury, multiple specialists and consultants were needed for C.V.'s care. C.V.'s condition required ICU admission for twenty-four to thirty-six hours for frequent neurological checks, and she was also under the care of a trauma surgeon and vascular surgeon in case she needed any further procedures. According to Dr. Kornhauser, the tear to the artery has "the chance to give [someone] a stroke or a permanent neurological dysfunction." Dr. Kornhauser testified that the assumption would be that the carotid artery tore when C.V. was reportedly choked, that he would have no way of knowing exactly when it occurred, and it could have occurred prior to July 15, 2021.

State's Exhibit 18, a Stipulation of Priors, signed by Vanhowten and his counsel, was admitted into evidence and read to the jury. The Stipulation of Priors

stated that the parties agreed that Vanhowten was convicted in Montgomery County, Texas, on June 9, 2006, of assault causing bodily injury to a family member, "an offense under Chapter 19, Chapter 22, Section 20.03, Section 20.04, or Section 21.11 of the Penal Code, against a person whose relationship to or association with the defendant is described by Section 71.003, 71.005 or 71.0021(b) of the Family Code[.]" The trial court instructed the jury that the prior conviction could only be considered for jurisdictional purposes.

The jury found Vanhowten guilty of the offense as charged in the indictment, and the trial court sentenced Vanhowten to twelve years of confinement. Vanhowten appealed.

Standard of Review

Where an appellant raises a jury charge error on appeal, the degree of harm necessary for reversal depends on whether the appellant preserved the error by a timely objection at trial. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). When, as here, the defendant fails to object or states in the trial court that he has no objection to the charge, we will not reverse for jury charge error unless the record shows "egregious harm" to the defendant. *See State v. Ambrose*, 487 S.W.3d 587, 595 (Tex. Crim. App. 2016) ("[U]npreserved jury-charge error does not require a new trial, even when the error is complained of in a motion for new trial, unless the error causes 'egregious harm.'"); *Ngo v. State*, 175 S.W.3d 738, 743-44 (Tex.

Crim. App. 2005) (citing *Bluitt v. State*, 137 SW.3d 51, 53 (Tex. Crim. App. 2004);

*Almanza*, 686 S.W.2d at 171. "Errors that result in egregious harm are those that

affect 'the very basis of the case,' 'deprive the defendant of a valuable right,' or

'vitally affect a defensive theory.'" *Ngo*, 175 S.W.3d at 750. An appellant must have

suffered actual harm, not merely theoretical harm. *See Sanchez v. State*, 376 S.W.3d

767, 775 (Tex. Crim. App. 2012) (citing *Arline v. State*, 721 S.W.2d 348, 352 (Tex.

Crim. App. 1986)). We review jury charge error by a two-step process. *Ngo*, 175

S.W.3d at 744. First, we determine whether error exists in the jury charge. *Id.*

Second, we determine whether sufficient harm was caused by the error to require

reversal. *Id.* To determine whether egregious harm resulted, we examine "the entire

jury charge, the state of the evidence, including the contested issues and weight of

probative evidence, the argument of counsel and any other relevant information

revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171.

## Analysis

The application paragraph of the jury charge provided the following:

> Now, if you find from the evidence beyond a reasonable doubt
> that on or about July 15, 2021, in MONTGOMERY COUNTY,
> TEXAS, the defendant GEORGE VANHOWTEN, did then and there
> intentionally, knowingly, or recklessly cause bodily injury to [C.V.], a
> member of the defendant's family or a member of the defendant's
> household or a person with whom the defendant has or has had a dating
> relationship, as described by Section 71.003 or 71.005 or 71.0021(b),
> Family Code, by intentionally, knowingly, or recklessly impeding the
> normal breathing or circulation of the blood of [C.V.] by applying
> pressure to [C.V.]'s throat or neck, and you further find that, before the

10

commission of the offense alleged above, that the defendant had been previously convicted of an offense under Chapter 19, Chapter 22, Section 20.03, Section 20.04, Section 21.11 of the Penal Code, against a person whose relationship to or association with the defendant is described by Section 71.003, 71.005 or 71.0021(b) of the Family Code, to wit: on June 9, 2006, in the County Court at Law Number 1, of Montgomery County, Texas, in Cause Number 06-213364.

If you do not so find, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict not guilty.

On appeal, Vanhowten argues that the application's conditional clause that never concludes with what the jury should do if the condition is met resulted in an error because the trial court failed to instruct the jury on when they should legally convict Vanhowten. The State asserts that the omission of the "then" portion of the conditional statement was an inadvertent oversight, and Vanhowten asserts the omission was the result of "a word processing glitch." Vanhowten concedes he did not object to the charge on the basis on which he appeals, and that, under *Almanza*, the "egregious harm" standard applies.

In support of his claim that he suffered egregious harm, Vanhowten only addresses the first *Almanza* factor, the entire jury charge. As to that factor, he argues that other portions of the application paragraph are vague and confusing, and that the jury was not provided with the statutory language of all of the statutes referred to in the charge.

After the conditional phrase in the application paragraph, the charge should have included the language that if the jury found the elements of the charged crime

11

beyond a reasonable doubt, then they should find the defendant guilty. *See, e.g.,* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Criminal Pattern Jury Charges: Crimes Against Persons & Property*, CPJC 85.4 (2020). We agree that the omission of this language constituted a jury charge error. However, to obtain a reversal, Appellant must show that he has suffered egregious harm. *See Almanza*, 686 S.W.2d at 171. In determining whether he suffered egregious harm, we examine the entire jury charge, the state of the evidence, the argument of counsel, and any other relevant information revealed by the trial record. *See id.*

Before the application paragraph, the jury charge stated that Vanhowten had been charged with the felony offense of Assault Family Violence Impeding Breath or Blood Circulation with a Prior Family Violence Conviction. The jury charge then instructed the jury as to the elements of the offense. The application paragraph followed the language of the elements of the offense but then omitted the clause "then you will find the defendant guilty." The charge then stated an obvious alternative, "[i]f you do not so find, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict not guilty." The charge further instructed that "[t]he prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it fails to do so, you must acquit the defendant." The charge explained, "[y]our sole duty at this time is to determine the guilt or innocence of the

12

defendant under the indictment in this cause and restrict your deliberations solely to the issue of guilt or innocence of the defendant." Considering the entire jury charge, the jury could have logically inferred the omitted language and it had sufficient instruction in the charge regarding when to find the defendant guilty, and that "[t]he prosecution has the burden of proving the defendant guilty and it must do so by proving each and every element of the offense charged beyond a reasonable doubt and if it fails to do so, you must acquit the defendant."[2]

The evidence presented to the jury also supports a finding of no egregious harm. At trial, C.V. testified to the details of the assault, that Vanhowten impeded her breathing, that she was hospitalized with a torn artery on the right side of her neck which was the same area where Vanhowten had put pressure on her neck, and that she had to stay in an intensive care unit for a few days. A neighbor testified that she called 911 and the police after she saw the man and woman who lived across the

---

[2] Vanhowten's claims that other portions of the jury charge are vague or fail to provide statutory language and also cause confusion, but his arguments are not supportive of his claims regarding the omitted language in the application paragraph. As to Vanhowten's argument that the verdict form included a paragraph for conviction of a lesser-included offense but nowhere else in the charge is there a lesser included offense mentioned, we note that the lesser-included offense paragraph originally included was prefaced on if the jury made no finding of a prior conviction. After the jury submitted a question during deliberations concerning the circumstances under which they would consider that instruction, and after a discussion on the record outside the jury's presence regarding the stipulation admitted into evidence, the trial court ultimately drew lines through that portion of the charge and sent it back to the jury indicating that the lesser-included offense paragraph was not to be considered by the jury in reaching a verdict.

street in the road, the man was on top of the woman, he was holding the woman down with his knee on her waist and stomach, the woman was trying to get up, and the woman was screaming for help. Colleen, C.V.'s friend, testified that when she took C.V. to the hospital after the assault, C.V.'s voice was raspy, she was in shock and crying, she appeared to be in pain, and she was having difficulty breathing, swallowing, and talking. According to Colleen, the photographs that she took of C.V. that day and that were admitted into evidence at trial show scratches and discoloration to various parts of C.V.'s body, including to her neck. Officer Bush testified that C.V. reported that Vanhowten held her down, put his knee to her chest and his arm across her throat and mouth trying to hold her down while he looked through her phone, the fight continued, he held her down while pushing his knee on her chest "and arm on her neck[,]" and then the assault continued outside. Officer Bush testified that C.V. reported that during the assault it was hard for her to breathe and hard to get air in, and that she thought she was going to pass out multiple times. Dr. Kornhauser testified that he examined C.V. at the hospital on the day of the assault and that C.V. appeared distraught and reported that her husband attacked and choked her and put his knee to her chest. Dr. Kornhauser ordered tests even though C.V.'s neck appeared normal, and she was talking and breathing fine. Dr. Kornhauser testified that "it happens all the time[]" for someone to press down hard enough on someone's neck to make it difficult to breathe while the pressure is on

but it may not leave bruises. He testified that the tests revealed a small tear in C.V.'s internal carotid artery on the right side and that she had to be admitted to ICU for critical care.

During voir dire, the trial judge explained to the venire members that their verdict should be "guilty" if they believed that the State proved the elements beyond a reasonable doubt, and "not guilty" if they did not. During the defense's closing argument, defense counsel explained the burden of proof and the options in the jury charge:

> So take your time and read that jury charge and see -- and go over each element and see if they have met that very high burden of proof, which you will find they did not.
> Now, remember we talked about what "not guilty" may mean. It may mean you don't believe he did this at all, period, or -- it may mean that there is not enough credible evidence to reach the burden of proof. Do you see the difference? There is a big difference there.
> If you don't think he is innocent, if you think he probably did it but we don't think that the State has reached the burden of proof, so we have to put "not guilty" because we don't have a maybe or anything like that. We have two choices, guilty or not guilty. That's it.
> . . . .
> So when you go back and deliberate this case, ladies and gentlemen, take a look at that jury charge that is so wordy and apply facts that you find to each element and ask yourselves as a group collectively if they have met their burden of proof beyond a reasonable doubt[.]

During the State's closing argument, the prosecutor explained what was required for a conviction:

> But there is a simple clear explanation for all of the evidence in this case. And that evidence is inescapable. That explanation is that

15

George Vanhowten beat her, held her down, put his arm across her neck and made it difficult for her to breathe. That has all been proven beyond any reasonable doubt.

Now it is time to hold him responsible for what he did. Now it is time to speak the truth. Now it is time to go back in that room and return a guilty because that's what he is.

Considering the entirety of the record, we find no egregious harm. We overrule Vanhowten's issue on appeal.

We note that the section of the judgment entitled "Offense for which Defendant Convicted[]" states "ASSAULT FAMILY STRANGULATION" and the "Statute for Offense[]" recites "22.01(b-2)[.]" The jury found Vanhowten "guilty of Assault Family Violence Impeding Breath or Blood Circulation with Prior Family Violence Conviction, as charged in the Indictment[,]" and the jury charge tracks the language of section 22.01(b-3) of the Texas Penal Code. *See* Tex. Penal Code Ann. § 22.01(b-3). This Court has the authority to reform the trial court's judgment to correct clerical errors. *See* Tex. R. App. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27 (Tex. Crim. App. 1993).

We therefore reform the trial court's judgment to delete the offense "ASSAULT FAMILY STRANGULATION" and to substitute "ASSAULT FAMILY VIOLENCE IMPEDING BREATH OR BLOOD CIRCULATION WITH PRIOR FAMILY VIOLENCE CONVICTION" and to delete reference to "22.01(b-2)" and to substitute "22.01(b-3)[.]"

16

Having overruled Appellant's issue, we affirm the judgment of the trial court as reformed.

AFFIRMED AS REFORMED.

_____
LEANNE JOHNSON
Justice

Submitted on December 1, 2022
Opinion Delivered March 1, 2023
Do Not Publish

Before Golemon, C.J., Horton and Johnson, JJ.